*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* O O CLAUDIO-PEREZ, Minor.

UNPUBLISHED
September 22, 2022

No. 360356
Kalamazoo Circuit Court
Family Division
LC No. 18-000181-NA

Before: MURRAY, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her minor child, OOCP, pursuant to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j). Mother argues that her plea of admission taken by the trial court was not knowingly, understandingly, and voluntarily made in light of her language and cultural barriers[1] and that she did not receive reasonable efforts toward reunification. We affirm.

## I. BACKGROUND

The primary barriers to reunification throughout the case were mother's physical abuse and medical neglect of her child, OOCP.[2] Mother could not demonstrate the capacity to care for her medically fragile child, who suffered from a rare life-long condition called Ehlers-Danlos syndrome, which affected the production of connective tissues. Because of his condition, OOCP was highly susceptible to serious injury, would bruise on minimal impact, bled profusely when cut, and required extensive and frequent medical attention. OOCP also had other medical conditions, including atrial septal defects, asthma, and developmental and speech delays. In 2015, mother, who was 15 years old at the time, fled from Guatemala to the United States with OOCP

---

[1] Mother's primary language was tribal Guatemalan, but she also spoke Spanish.

[2] Father's parental rights are not at issue in this appeal. The trial court terminated father's parental rights pursuant to MCL 712A.19(b)(3)(a)(*i*), (*ii*), and (j), finding that father was unidentifiable, deserted OOCP, and that there was a reasonable likelihood that OOCP would be harmed if placed in fathers care.

and arrived at the southern border of Arizona, where they were placed in a federal refugee program for two years until they relocated to Kalamazoo in October of 2017[3].

OOCP was removed from mother's care following an incident on April 25, 2018, when OOCP was admitted to Bronson Children's Hospital to assess bruising found on his left buttock that extended to his perineum and left scrotum[4]. Mother claimed that she saw a dime size bruise when she changed OOCP on Friday after school, noticed that the bruise became larger on Sunday, but did not seek care until Tuesday and only after a Bethany Christian Services (BCS) worker encouraged her to seek medical attention for OOCP. Mother reported that she did not know where OOCP's injury came from. OOCP also had bruises that wrapped around his bilateral lower extremity, which appeared to be at various stages of healing. The attending physician reported that OOCP's unexplained injury, which she opined was not consistent with a fall, coupled with mother's failure to promptly seek medical care, indicated that OOCP's injury was a product of abuse.

On that same day, April 25, 2018, the court authorized the Department of Health and Human Services (DHHS) to petition to remove OOCP from mother's care, finding that OOCP would be at a substantial risk of harm if he were to remain in the home with mother, given mother's lack of understanding, or disinterest in, OOCP's medical condition. The following day, OOCP was discharged from the hospital and placed with a foster family.

At the time DHHS filed its petition, mother and OOCP, who at the time was three years old, had lived together in a BCS group home for teenage refugees, which offered resources to mother, including a respite program, counseling services, parenting classes, behavior specialists, and Spanish interpreters when necessary. However, mother's engagement in these services was noted to be inconsistent or nonexistent[5].

---

[3] When OOCP was 9 months old, he only weighed 9 pounds and had curved feet, pigeon toes, droopy eyes, was brittle and frail, unable to sit up, and did not meet any of his milestones. On October 26, 2015, OOCP was sent to Phoenix Children's Hospital, where the attending physician inserted a feeding tube.

[4] This incident followed prior incidents of medical neglect and physical abuse. On March 28, 2018, OOCP presented at Bronson Medical emergency room after an unwitnessed fall in the bathroom of the group home, at which mother and OOCP were residing. Two witnesses observed mother being verbally mean and physically abusive to OOCP by shaking him, slapping his face and buttock, slamming him on the floor and the bed, and pressing on an old bruise to make him cry.

[5] Several BCS staff members reported that mother refused to engage in services, despite the availability of interpretation services, had anger issues, was not cooperative, lacked interest, and was often disengaged. The group home's behavior specialist reported concerns that mother was not attached to, and was even resentful of, OOCP, that she would place him in a high chair so that he could not play with other children, and that she would not sit with him during meals.

After OOCP was removed from mother's care, DHHS prescribed a service plan which provided mother with a variety of services, including family team meetings, parenting time visits, transportation, psychological evaluations, mental health services, supportive visitation, parenting classes, English as a second language, and access to interpretation services[6]. The record shows that for the first two years and five months following the petition, mother was only partially compliant with the plan for reunification. During that time, mother completed her psychological evaluation and was diagnosed with having mixed personality disorder features[7]. Mother was also consistent with parenting time and was noted to be attentive, nurturing, and patient with OOCP. However, at the review hearing on December 12, 2018, mother requested that parenting time be changed from twice a week to once a week because she was stressed out and tired from working a full-time job. On the other hand, mother's attendance at OOCP's medical appointments was practically nonexistent. Consequently, mother missed extensive medical training on OOCP's condition at these initial appointments. Moreover, mother was inconsistent with counseling services and needed to be re-referred several times. Mother also had little engagement with the agency workers, as the record reveals that she would not answer her phone or avoided contacting them.

It was not until October of 2020 that mother became more compliant with the service plan. Mother started attending OOCP's medical appointments, reinitiated counseling services, and completed parenting classes. However, Vanessa Guerrero testified that despite mother's recent efforts to become more involved in OOCP's care, her understanding of OOCP's condition remained superficial, in that she did not comprehend that Ehlers-Danlos was a life-long condition requiring a significant amount of supervision or the imposition it would have on her life being a single mother that worked full time should she regain custody of OOCP.

The trial court held a four-day termination hearing from March 3, 2021, to October 5, 2021. By the time of the termination proceedings, mother had obtained her driver's permit and an insured vehicle but still required transportation assistance because she was too afraid to drive. While mother also secured suitable housing, the record shows that mother relied on her boyfriend, whose name was not on the lease, to pay for a majority of the rent, as she could not pay the full rent on her own.

Ms. Guerrero testified at the termination hearing that mother still had not taken the initiative to dive more into OOCP's cognitive or physical future delays. Although Ms. Guerrero provided mother with more information regarding appointments, nutrition, daily care routines, and first aid tips, she opined that mother had not improved much in this regard, stating that mother lacked the initiative and motivation to do so. Ms. Guerrero further testified that because of

---

[6] The first two DHHS caseworkers assigned to mother's case, Liza Smith and Vanessa Guerrero, communicated with mother in Spanish. Although mother's third caseworker, Andrea Vojtko, did not speak Spanish, she utilized translation services via phone during her encounters with mother.

[7] However, mother was dishonest to the evaluator as she denied a history of abuse or neglect, although the record indicates otherwise. Mother had a significant history of violence and sexual assault in her familial setting, as OOCP was a product of rape and incest. Mother had OOCP was she was only 15 years old, and OOCP's father was believed to be mother's first cousin.

mother's language barrier, she struggled to make necessary medical appointments for OOCP and would rely on the caseworkers to tell her what to do.

BCS caseworker Andrea Vojtko similarly testified at the termination hearing that mother struggled with organizing OOCP's medical appointments. Ms. Vojtko explained that OOCP's ear, nose, and throat doctor referred OOCP for a hearing test, and although mother was given multiple reminders to schedule his appointment, she did not take the initiative and instead relied on Ms. Vojtko to do it. That was not an isolated incident, as Ms. Vojtko further testified that she also had to give mother several written and verbal reminders before she actually scheduled OOCP's eye, orthopedic, and geneticist appointments. On June 30, 2021, Ms. Vojtko assisted mother with scheduling OOCP's doctors' appointments. However, mother refused to speak to the receptionist or leave voicemails. Ms. Vojtko further testified that mother did not inquire about OOCP's progress or updates at his medical appointments. Ms. Vojtko also discussed her concerns that mother frequently utilized parenting time to focus on her personal tasks rather than engaging with OOCP. For example, mother had asked the caseworker for assistance with making a maintenance request at her apartment or for help fixing her phone. Furthermore, rather than discouraging inappropriate behavior, such as throwing toys at people, mother found that conduct humorous and laughed.

The trial court ultimately terminated mother's parental rights on October 5, 2021, three years and five months after the petition was filed, finding that mother did not fully comprehend the abuse that she inflicted on OOCP or the significance of his condition despite ample opportunities provided to mother to learn to care for OOCP's needs and how to properly discipline him. The trial court found that despite the extraordinary length of this case, mother had done nothing to educate herself regarding OOCP's fragile medical condition as she hardly inquired into his progress in therapy and continued to struggle with scheduling OOCP's medical appointments. The court further noted that while mother attended almost every parenting time, OOCP needed a parent who was engaged, asked questions, learned about his medical conditions, and not just a parent who showed up. The court also found that it was in OOCP's best interests to terminate mother's parental rights because of mother's inability or unwillingness to improve her ability to care for OOCP's fragile medical condition.

## II. STANDARD OF REVIEW

Adjudication errors raised for the first time on appeal from an order terminating parental rights are reviewed for plain error. *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019). We review a preserved issue regarding whether reasonable efforts were made toward reunification for clear error, *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005), but unpreserved issues are reviewed for "plain error affecting substantial rights," *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). Mother concedes on appeal that no objection was made to indicate that the services provided to her were inadequate; therefore, the issue is not preserved. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). To demonstrate plain error, respondent-mother must establish that (1) error occurred; (2) the error was plain, i.e., clear or obvious; and (3) the plain error affected their substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Regarding the second prong, a "clear or obvious" error is one that is not subject to reasonable dispute. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020). Generally, an error has affected a party's substantial rights, under the third prong, if it caused prejudice, affecting the outcome of the lower court proceedings. *Id.*

-4-

## III. ADJUDICATION

Mother first argues that her plea of admission taken by the trial court was not knowingly, understandingly and voluntarily made in light of her language and cultural barriers.

MCR 3.971 governs the entry of pleas in termination cases. MCR 3.971(D)(1)[8] requires the court to "satisfy[] itself that the plea is knowingly, understandingly, and voluntarily made" before it accepts the plea. At the time of the plea proceeding on June 27, 2018, the trial court was aware that mother, who immigrated to the United States as an unaccompanied refugee minor from Guatemala, had significant cultural and language barriers. The trial court provided a Spanish interpreter but failed to place the interpreter under oath nor placed the interpreter's qualifications on record. Mother argues that because of the trial court's omissions, she could not understand the eventual consequences of her plea of admission.

While the trial court erred by failing to swear in the interpreter[9], the court nevertheless satisfied itself that mother's plea was knowingly, understandingly, and voluntarily made under MCR 3.971(D)(1). At the adjudication hearing, the trial court explained to mother, with the use of a Spanish interpreter, the purpose of the hearing, advised her of the terms of the plea agreement, and informed mother of her right to proceed to trial in lieu of making any admissions to the petition. The court informed mother of the prosecutor's role, her right to an attorney, and her ability to cross-examine witnesses and present evidence if she proceeded to trial. The court continued to advise mother of the potential consequences of her admissions, such as that the court would take jurisdiction over OOCP and that her plea could later be used to support grounds for termination of her parental rights. At no point did mother notify the court or her counsel that she did not comprehend the purpose of the adjudication hearing or the consequence of her admissions.[10] Rather, mother repeatedly stated on the record that she understood and that she nonetheless wished to proceed with her plea.

---

[8] Mothers incorrectly cites MCR 3.971(C)(1) in her brief, arguing that her plea of admission was not "knowingly, understandingly, and voluntarily" made. However, the appropriate subsection is MCR 3.971(D)(1).

[9] MRE 604 provides that interpreters are subject to the administration of an oath or affirmation to make a true translation.

[10] Interestingly, the record indicates that mother often exaggerated the significance of her language barrier. For example, BCS group home house supervisor, Blanca Ramirez, reported that mother's ability to understand and communicate in English was at a moderate level, although she often used it as an excuse to not communicate with people. BCS group home therapist, Felicia O'Connor, similarly reported that while mother spoke decent English, she often acted like she did not understand when staff members attempted to question her about incidents. On January 25, 2018, CPS provided mother with a Duty to Warn letter, and although the letter was written in English, mother admitted that she could read it. Moreover, mother's first caseworker, Liza Smith, testified that she spoke to mother in both English and Spanish and that mother understood English well.

Mother has also failed to show how the trial court's error of permitting the interpreter to translate the proceedings without first being sworn had affected her substantial rights. Mother did not raise any inconsistencies in the interpreter's translation, nor did she object to the interpreter's qualifications. Instead, during the adjudication hearing, mother affirmed the allegations in the petition, indicating several times that she understood the potential consequences of her plea. Notably, the trial court interpreter utilized during the adjudication hearing was no stranger to the court in terms of providing interpretation services.[11] In fact, the same interpreter was utilized in the majority of the hearings in this case. Yet, mother never challenged the accuracy of her translation to the court, nor did her Spanish speaking caseworkers, who were mostly present during these proceedings. Mother has not presented any evidence showing that the trial court's error affected the fairness, integrity or public reputation of judicial proceedings. *Carines*, 460 Mich at 773.

## IV. REASONABLE EFFORTS AT REUNIFICATION

Mother argues that DHHS failed to make reasonable efforts toward reunification when it failed to accommodate her to permit her attendance at OOCP's medical appointments and other services. Specifically, mother claims that her caseworker told her she need not attend OOCP's medical appointments or engage in other services but was later faulted for not understanding OOCP's medical condition or complying with services.

After a child has been removed from a parent's custody, DHHS is generally required to make reasonable efforts to reunify the child and the family before seeking termination of parental rights. MCL 712A.19a(2). "[T]he Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks/Brown*, 500 Mich 79, 85–86; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(d) (stating that the service plan shall include a "[s]chedule of services to be provided to the parent . . . to facilitate the child's return to his or her home"). "Not only must respondent cooperate and participate in the services, she must benefit from them." *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). But if a parent is simply unable to meet the needs of her child, then "the needs of the child must prevail over the needs of the parent." *In re Terry*, 240 Mich App 14, 28; 610 NW2d 563 (2000) (quotation marks and citation omitted). In order to prevail on the argument that petitioner's reunification efforts were inadequate, respondent must demonstrate that she would have fared better if sufficient services were offered. *In re Fried*, 266 Mich App at 543.

Upon review of the record, we hold that the trial court did not err in finding that reasonable efforts were made to reunify mother and OOCP. Before the petition was even filed, on April 25, 2018, BCS offered counseling and parenting classes, which mother chose not to fully engage in. After OOCP was removed from mother's care, DHHS prescribed a service plan and provided mother with a variety of services, including family team meetings, supervised parenting time visits,

---

[11] The trial court stated at the review hearing in November of 2020 that the same interpreter that provided translation services at the adjudication hearing in June of 2018 "is well known in the Ninth Circuit Court for being an interpreter, and so [the court did not] have to make certain finding[s][.]".

transportation, psychological evaluations, mental health services, supportive visitation, parenting classes, and English as a second language. DHHS also provided translation support to mother, as her first two caseworkers both spoke Spanish and made alternative interpretation services available.

Contrary to mother's claims that her first caseworker, Liza Smith, told her it was not important to attend OOCP's medical appointments, the record shows that mother was well aware, for many years preceding the petition, of the seriousness of OOCP's condition[12] and his need for consistent medical care and attention. DHHS also notified mother early on that she was expected to be present for OOCP's medical appointments and provided mother with a calendar detailing parenting time and medical appointment dates. Indeed, OOCP's fragile medical condition and extensive medical needs, coupled with the fact that he was removed from mother's care because of medical neglect, clearly signified the importance of mother's involvement in OOCP's medical care after the fact. However, for the first two years and five months following the petition date, mother's attendance at OOCP's medical appointments was practically nonexistent. Because of mother's absence at these initial appointments, which she had notice of but did not attend, she missed medical training and education on OOCP's medical condition and how to properly care for him.

The record shows that on numerous occasions, mother discussed and requested, at her own accord, the possibility of changing the permanency goal from reunification to guardianship as early as May 4, 2018[13]. While the caseworker admitted that with the goal of guardianship in mind, the department might not have initially encouraged mother enough to attend OOCP's appointments, the trial court properly noted that mother was well aware of the seriousness of OOCP's medical condition and given ample opportunity to participate in his care and yet had done nothing to educate herself on how to care for her child. Even when mother reinitiated her attendance at OOCP's appointments in October of 2020, almost two and a half years later, her involvement and understanding of his condition only minimally improved. In fact, in October of 2020 and in January of 2021, mother inquired about when OOCP's need for physical and occupational therapy would end, not acknowledging that therapy would be a lifelong circumstance. Even more, Ms. Guerrero testified at the termination hearing that mother had recently asked her what OOCP's condition was called. The trial court also pointed to the record indicating that mother failed to inquire about OOCP's progress or ask questions about what he was working on in therapy.

---

[12] The record shows that mother learned that OOCP had Ehlers-Danlos sometime while she was in Arizona from 2015 to 2017. Furthermore, mother had a significant CPS history, and was given two Duty to Warn letters, which detailed the seriousness of OOCP's condition and his need for prompt medical care.

[13] Mother indicates in her brief that DHHS created a "false goal" of guardianship so they would not need to make reasonable efforts toward reunification. However, the record indicates that it was mother herself who pushed for the goal change from reunification to guardianship for the first year following the petition. Regardless, DHHS initially placed the goal change for guardianship on hold until mother and OOCP received legal immigration status to avoid the risk of potential deportation.

The trial court found that mother had not demonstrated an ability to keep track of and schedule OOCP's medical appointments independently and instead relied on the caseworkers. DHHS delegated the responsibility of managing and scheduling OOCP's appointments to mother following her request for more accountability in this regard. While OOCP's condition, Ehlers-Danlos, could not be cured, the extent of damage could be dramatically decreased by the type of care received. Thus, because of OOCP's condition, he did not have the luxury of procrastinating even routine medical care. The trial court relied on the record and Ms. Vojtko's testimony, which indicated that on June 30, 2021, Ms. Vojtko assisted mother with calendaring and scheduling OOCP's upcoming medical appointments. Ms. Vojtko noted that mother did not have any of the contact information for OOCP's doctors, nor did she have any of OOCP's appointments written down. When it came time to leave voicemails for the doctors, mother refused and insisted that Ms. Vojtko handle it. Mother demonstrated continued neglect of OOCP, as Ms. Vojtko further testified that, on several occasions, she had to give mother multiple verbal and written reminders to schedule OOCP's medical appointments before mother actually did it. On one occasion, mother failed to schedule OOCP's hearing test following a referral from his ear, nose, and throat doctor. Because of mother's neglect to promptly schedule his prerequisite hearing test, his subsequent appointment was cancelled.

The record further shows that DHHS made repeated efforts to assist mother in obtaining her driver's license and explained to her the importance of being able to independently transport OOCP to his medical appointments. However, mother refused, indicating that she was too afraid to drive and relied on her boyfriend to drive her everywhere. DHHS also helped mother organize a plan to obtain her GED and later referred her to Kalamazoo Covenant Academy to enroll in school, although mother did not attend her scheduled admission exam. DHHS even assisted mother in locating suitable housing and provided application support

DHHS also provided mother with bus passes or transportation in the caseworkers' personal vehicles so she could attend parenting time visits. While mother almost always attended parenting time visits, Ms. Vojtko noted several occurrences where mother would utilize the time she and OOCP had together to accomplish personal tasks, such as asking for assistance with fixing her phone or making a maintenance request at her apartment, or even asking the parenting time supervisor to drive her to the bank or Walmart to shop for personal items.

The trial court found that despite the extraordinary length of this case, three years and five months, and DHHS' efforts, mother still did not fully comprehend the gravity of OOCP's medical condition and was unable to meet OOCP's needs. Moreover, mother has not demonstrated how she would have fared better if different services were offered, *In re Fried*, 266 Mich App at 543, and even testified on September 17, 2020, that her caseworker was assisting her with everything she needed. We conclude that the DHHS made reasonable efforts to provide mother with services and assistance to reunify her with OOCP. However, mother failed to participate in and benefit from the services offered to her. *In re TK*, 306 Mich App at 711. Accordingly, we hold that mother has not demonstrated plain error affecting her substantial rights.

Affirmed.

/s/ Christopher M. Murray
/s/ Colleen A. O'Brien
/s/ James Robert Redford